**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Tracy Anderson, | |
| Plaintiff, | Case No. 1:19-cv-05016 |
| vs. | |
| | Judge Sharon Johnson Coleman |
| Nations Lending Corporation, | |
| Defendant. | Magistrate Judge M. David Weisman |

**DEFENDANT'S MEMORANDUM IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Faegre Drinker Biddle & Reath LLP
Stacey L. Smiricky
stacey.smiricky@faegredrinker.com
Sylvia Bokyung St. Clair
sylvia.stclair@faegredrinker.com
331 S. Wacker Drive
Suite 4300
Chicago, Illinois 60606

Dated: November 30, 2020

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................. 1

ARGUMENT ................................................................................................................. 8

    I.    PLAINTIFF'S DISABILITY DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW. .................................................................................................................8

        A.    There is No Direct Evidence of Disability Discrimination............................ 9

        B.    Anderson's Disability Discrimination Claim Fails under the Indirect Approach ...................................................................................................... 11

    II.    PLAINTIFF'S FMLA INTERFERENCE CLAIM FAILS AS A MATTER OF LAW ...............................................................................................................14

    III.    PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW..........15

        A.    There is No Direct Evidence of Retaliatory Motive or Action .................... 15

        B.    Plaintiff's Retaliation Claim Fails under the Indirect Approach ................. 17

CONCLUSION............................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................................8

*Bunn v. Khoury Enters., Inc.*,
    753 F.3d 676 (7th Cir. 2014) ............................................................................................9, 13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................................8

*Coleman v. Donahue*,
    667 F.3d 835 (7th Cir. 2012) (Wood, J. concurring) .............................................................9

*Cracco v. Vitran Exp., Inc.*,
    559 F.3d 625 (7th Cir. 2009) ...................................................................................12, 15, 16

*Daugherty v. Wabash Ctr., Inc.*,
    577 F.3d 747 (7th Cir. 2009) ...............................................................................................16

*Dyrek v. Garvey*,
    334 F.3d 590 (7th Cir. 2003) ...............................................................................................14

*Guzman v. Brown Cnty.*,
    884 F.3d 633 (7th Cir. 2018) .................................................................................................9

*Hedberg v. Indiana Bell Tel. Co., Inc.*,
    47 F.3d 928 (7th Cir. 1995) .................................................................................................13

*Hopper v. Proctor Health Care Inc.*,
    804 F.3d 846 (7th Cir. 2015) .................................................................................................9

*Kohls v. Beverly Enters. Wisconsin, Inc.*,
    259 F.3d 799 (7th Cir. 2001) .........................................................................................13, 16

*Lloyd v. Swiftly Transp., Inc.*,
    552 F.3d 594 (7th Cir. 2009) ...............................................................................................11

*Long v. Teachers' Retirement Sys. of Illinois*,
    585 F.3d 344 (7th Cir. 2009) ...........................................................................................8, 16

*Lutes v. United Trailers, Inc.*,
    950 F.3d 359 (7th Cir. 2020) .........................................................................................15, 16

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................................8

*McCann v. Badger Mining Corp.*,
    965 F.3d 578 (7th Cir. 2020) ...............................................................14

*Monroe v. Indiana Dep't of Transp.*,
    871 F.3d 495 (7th Cir. 2017) ...................................................9, 13, 14

*Nicholson v. Pulte Homes Corp.*,
    690 F.3d 819 (7th Cir. 2012) ...............................................................15

*Ortiz v. Werner Enters., Inc.*,
    834 F.3d 760 (7th Cir. 2016) .............................................................8, 9

*Ridings v. Riverside Med. Ctr.*,
    537 F.3d 755 (7th Cir. 2008) ...............................................................15

*Robertson v. Dep't of Health Servs.*,
    949 F.3d 371 (7th Cir. 2020) ...............................................................10

*Simpson v. Office of Chief Judge of Circuit Court of Will County*,
    559 F.3d 706 (7th Cir. 2009) .........................................................16, 17

*Spring-Weber v. City of Chicago*,
    No. 18-c-4918, 2018 WL 4616357 (N.D. Ill. Sep. 26, 2018) ...............10

*Taylor-Novotny v. Health Alliance Med. Plans, Inc.*,
    772 F.3d 478 (7th Cir. 2014) ...............................................................11

*Terruggi v. CIT Group/Capital Fin., Inc. d/b/a CIT Rail*,
    709 F.3d 654 (7th Cir. 2013) ...............................................................10

*Thomas v. Christ Hosp. & Med. Ctr.*,
    328 F. 3d 890 (7th Cir. 2003) .................................................................8

*Walker v. JP Morgan Chase Bank, N.A.*,
    262 F. Supp. 3d 574 (N.D. Ill. 2017) .....................................................8

**FEDERAL STATUTES**

ADA .............................................................................................13, 17

Family Medical Leave Act......................................................................1

FMLA ................................................................................... passim

## <u>INTRODUCTION</u>

Plaintiff Tracy Anderson ("Anderson"), a former Pre-Fund Underwriting Auditor of Nations Lending Corporation ("NLC") was discharged for violating NLC's Standards of Employee Conduct. Specifically, Anderson was responsible for auditing and ensuring loan files were complete before they proceeded to the funding stage. Despite multiple reminders from her supervisor, Anderson continued to demonstrate poor work performance on her audits and failed to identify multiple errors. NLC ultimately decided to terminate Anderson after an independent review verified Anderson's violation of NLC's Standards.

Anderson claims she was terminated because of her perceived disabilities (*i.e.*, gall bladder surgery, history of cancer, anxiety, depression, and rheumatoid arthritis), that NLC interfered with her rights under the Family Medical Leave Act ("FMLA"), and she was terminated in retaliation for taking FMLA leave. However, Anderson's claim of discrimination fails because she cannot show that she was meeting NLC's legitimate expectations or that NLC treated any similarly situated employees better than Anderson. Anderson has no viable FMLA interference claim because NLC never denied her any FMLA rights to which she was entitled. Finally, Anderson's retaliation claim fails because Anderson's termination was not the result of her taking FMLA—rather, it was Anderson's repeated poor work performance—that caused her discharge. As more fully discussed below, NLC is entitled to judgment as a matter of law.

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

### <u>NLC Hires Anderson as a Pre-Fund Auditor</u>

Anderson began working at NLC as a Pre-Fund Underwriting Auditor on January 4, 2017. (Rule 56.1 Statement of Undisputed Facts ("SF"), ¶ 3). Anderson reported to Christine "Tina"

Gourley, the Auditing Manager. (SF ¶ 3) Throughout her employment at NLC, Anderson worked remotely from her home in Illinois, and never met Gourley in person. (*Id*.)

As a Pre-Fund Underwriting Auditor, Anderson was responsible for ensuring that all critical details and loan quality standards for residential mortgage loan applications were satisfied before the loan applications were moved to the funding stage. (SF ¶ 4). Anderson was tasked with re-underwriting loan files to determine if the Underwriter has approved a loan and met all requirements to ensure that the loan is saleable, and identifying deficiencies that warrant additional due diligence to ensure that loans do not contain any evidence of what could be construed as misrepresentation or fraud (*i.e*., alterations to documents that may indicate the use of white-out or correction fluid). (SF ¶¶ 4-5) If there was any portion of the loan that had been completed incorrectly by the Underwriter, it was the Pre-Fund Underwriting Auditor's job to cite these deficiencies and inform the Underwriter to address and fix them prior to closing the loan. (SF ¶ 6). The Underwriter made the necessary corrections to the file to ensure that the loan met all required guidelines and there were no further questions on the validity of the documentation in the file (in the case where discrepancies or alterations may be concerned) (SF ¶ 7).

Loan quality standards were set forth by Fannie Mae and Freddie Mac, the Government National Mortgage Association, and the U.S. Department of Housing and Urban Development ("HUD") (collectively referred to as the "Mortgage Agencies"). (SF ¶ 10). All Pre-Fund Underwriting Auditors, like Anderson, were required to maintain up-to-date knowledge of Mortgage Agencies' guidelines. (SF ¶ 11). Accurate performance of the pre-fund auditing function was critical to ensure that NLC met the Mortgage Agencies' loan quality standards. (SF ¶ 12).

Anderson would regularly find a deficiency in the loans she audited, which highlighted the need for the Pre-Fund Underwriting Auditor to have excellent attention to detail. (SF ¶ 13).

Anderson's failure to ensure that these files meticulously met Mortgage Agencies' standards could result in substantial loss of revenue for NLC. (SF ¶ 14).

The Mortgage Agencies randomly and routinely audit the loan file submissions and disclose the results of the audits at their own timing. (SF ¶ 15). NLC does not participate in the selection of files that are audited by the Mortgage Agencies, the Mortgage Agencies' audit processes, or the timing of their determinations. (SF ¶ 16). On average, the audit department reviewed between 150 and 250 early payment default ("EPD") loans during a given year. (SF ¶ 17). An EPD loan is a loan that has a 60-day late payment within the first six payments. (*Id.*) When HUD completed its audits on EPD loans, it also considered a loan to be in early payment default status if the borrower had a 60-day late payment within the first six payments after a modification. (*Id.*) Therefore, HUD may conduct an audit more than six months after a loan is first originated. (*Id.*) NLC does not have any control over when HUD audits a loan. (SF ¶ 18). Anderson and Gourley do not communicate directly with HUD and have no advance information on what files will be audited or when HUD audits the loans. (SF ¶ 19).

NLC also performed its own internal post-funding audit of loans to ensure regulatory compliance. (SF ¶ 20). All EPD loans are audited, and about 10% of the remaining loans audited by the Pre-Fund Underwriting Auditors are randomly selected for post-funding audit. (*Id.*)

### Anderson's Performance

At the time of hire, Anderson represented that she had over 20 years of industry experience, and therefore Anderson was expected to begin auditing files after job shadowing a senior Pre-Fund Underwriting Auditor and training on NLC guidelines. (SF ¶ 21). In her first year of employment, Gourley had verbal conversations with Anderson and provided ongoing training to her regarding her mistakes on her files, and Gourley believed that Anderson just needed to get into the groove

of her job duties and needed time to settle into her job. (SF ¶ 22). These mistakes did not create salability issues but rather were mistakes that Gourley attributed to Anderson rushing through her files. (*Id*.) Based on Anderson's represented experience, Gourley did not expect that she would have to repeatedly remind Anderson to take her time to avoid mistakes and perform her audits more accurately. (*Id*.)

Anderson requested and took time off from May 5-10, 2017 (SF ¶ 23) and an extended leave on October 6, 2017 to January 14, 2018, which NLC approved and reinstated her upon her return from leave. (SF ¶ 24). On December 18, 2017, Julia (Sargent) Harmuth notified Gourley about multiple issues with Anderson's review, including miscalculations on taxes. (SF ¶ 25). After Anderson returned from her leave, on January 17, 2018, Gourley emailed Anderson about these multiple errors and requested she complete her training before she began auditing files. (*Id*.) Anderson was unable to explain her incorrect analysis and stated, "I will be more diligent next time for these items moving forward." (SF ¶ 26). Gourley emphasized that Anderson "need[s] to ensure we're taking the time to ensure accuracy on Pre-Fund Audits." (SF ¶ 27). Gourley believed that Anderson was capable of correctly doing her job, but she was moving too quickly through the files and making mistakes. (*Id*.) Gourley counseled Anderson to slow down. (*Id*.)

On February 22, 2018, Harmuth identified an error with the income calculation on a file that Anderson should have caught during her review. (SF ¶ 28). Anderson made several mistakes on the file, including failure to verify income, failure to identify missing documentation in the file, such as the paystubs and W-2s, to support the stated income, and the verification of employment was over a year old. (*Id*.) Harmuth requested an explanation from Anderson, who had taken time off from February 23-28, 2018, and did not respond until March 1, 2018 after she returned to work. (*Id*.) Anderson claimed that she could not "remember" how she made her income calculations

because her notes were gone and offered no explanation about her miscalculations. (SF ¶ 29).
Gourley counseled Anderson that not having her notes did not excuse her failure to reply and did
not relieve her of the obligation to provide an explanation for her identified discrepancies. (SF ¶
30). Ultimately, Anderson admitted she made a mistake, stating "I am already pissed off and mad
at myself…. [*sic*] a mistake [*sic*] I don't normally make mistakes on income." (SF ¶ 31).

### Anderson's Spring 2018 Leave

In Spring 2018, Anderson told Gourley that she was not feeling well and requested an
extended leave. (SF ¶ 32). Anderson expressed her concern that she would lose her job while she
was out on leave and she wanted to make sure she was protected. (SF ¶ 34). Gourley encouraged
Anderson to speak to Human Resources. (*Id.*) Anderson did not inform Gourley why she needed
the leave or how long she expected to take off of work. (SF ¶ 35).

Initially, Anderson worked with Suelle Simpson in Human Resources to complete her
FMLA paperwork, but Lisa (Reigelsberger) Taylor, Human Resources Associate, assisted
Anderson after Simpson's departure from NLC to ensure Anderson's FMLA paperwork was
complete. (SF ¶ 36). On May 21, 2018, Taylor confirmed that NLC had received documentation
from her doctor, and her leave request was approved from March 19-June 9, 2018. (SF ¶ 37).

### Anderson's Performance Issues Uncovered During Her Leave of Absence

On March 23, 2018, NLC received notice about numerous deficiencies in loans that
Anderson had reviewed and failed to identify deficiencies:

- In Anderson's January 24, 2018 audit, she missed critical information relating to the appraisal. (SF ¶ 38).

- In Anderson's January 25, 2018 audit, she: (i) failed to properly calculate escrows and tax; (ii) failed to identify a full appraisal log; (iii) failed to recognize that appraiser information was missing; (iv) failed to identify an erroneous declaration; (v) failed to recognize that a form was missing; and (vi) failed to identify an incorrect approval date. (*Id.*)

- In Anderson's January 26, 2018 audit, she: (i) failed to properly calculate applicants' income, which should have made the loan ineligible; (ii) failed to include proper information regarding income calculations; (iii) failed to recognize that employment was not adequately documented; (iv) failed to validate information; (v) and failed to identify incomplete bankruptcy paperwork and the calculations of permissible payments. (*Id.*)

Anderson's failure to identify these deficiencies and work immediately with the Underwriters to remediate the errors caused loans to be closed with incurable defects. (SF ¶ 39).

Further, on May 1, 2018, HUD provided notice to NLC that a review performed on June 20, 2017 contained deficiencies, because she: (i) failed to report that an income verification page had been altered with correction fluid; and (ii) failed to verify the monthly income amount. (SF ¶ 40). This file was individually audited by Anderson. (*Id.*) HUD cited its highest deficiency on this file because the verification of employment had correction fluid on it. (*Id.*)

In May 2018, Gourley met with Sam Asher, who had recently joined NLC as the Director of Human Resources, about Anderson's history of poor performance and the frequency of deficiencies recently found in her audits. (SF ¶ 41). Gourley did not believe that Anderson's level of performance was consistent with the years of experience Anderson had and she was not demonstrating that she could perform her job duties. (*Id.*) Gourley recommended Anderson's termination based on her repeated performance issues and the frequency of the deficiencies, and Anderson's violation of the NLC's Standards of Employee Conduct. (*Id.*)

Asher investigated Anderson's violation of NLC's Standards[1] and Gourley's reasons supporting Anderson's termination which consisted of reviewing Gourley's evidence to support Anderson's termination, a summary of deficiencies found in Anderson's audits before and during

---

[1]Section 3.01 of the Standards of Employee Conduct states that violations of NLC's Standards, such as "[p]oor work performance," "will result in corrective action" and that NLC "may determine that certain offenses are serious enough to skip corrective action and warrant immediate termination, and reserves the right to skip or repeat corrective actions." (SF ¶ 47). Anderson acknowledged receiving a copy of the Employee Handbook. (SF ¶ 48).

6

her leave, interviewing Gourley, and consulting with legal counsel. (SF ¶ 42). Asher had not yet

completed his investigation when Anderson was due to return from leave. (SF ¶ 43). Accordingly,

Asher recommended Anderson spend her time getting re-acclimated with her job duties when she

returned on June 11, 2018. (*Id*.)

### Anderson Returns to Work and is Terminated for Repeated Performance Issues

On June 11, 2018, Anderson returned to work after her leave. (SF ¶ 44). Anderson did not

request an accommodation for any disability in order to perform her job duties. (SF ¶ 45). Gourley

instructed Anderson to review her emails from the past 12 weeks and any updated or revised

Mortgage Agencies guidelines and NLC guidelines. (SF ¶ 46). Anderson also was required to

complete courses provided by NLC before Anderson began auditing files again. (*Id*.)

NLC completed its investigation into the reasons supporting Anderson's termination. (SF

¶ 49). Within a day of NLC closing its investigation, on June 15, 2018, Gourley and Asher met

with Anderson to discuss her performance issues and the deficiencies that were uncovered during

her leave. (*Id*.) Gourley and Asher advised Anderson of NLC's decision to terminate her because

of repeated poor performance. (SF ¶ 50).

### Anderson's Performance Issues Uncovered After Her Termination

After Anderson's termination, NLC received notice of four additional loans that Anderson

had produced inaccurate audits. (SF ¶ 51).

• On July 2, 2018, NLC learned that on Anderson's June 21, 2017 audit, she failed to identify that risk approval for a gift was required on the loan because of the interested party status between the borrower and gift donor. (*Id*.)

• On July 2, 2018, NLC learned that on Anderson's September 7, 2017 audit, she: (i) failed to identify missing HOA dues; and (ii) failed to recognize that verifications for certain accounts were missing. (*Id*.)

• On September 28, 2018, NLC learned that on Anderson's September 27, 2017 audit, she: (i) failed to identify the source of multiple large deposits; (ii) failed to identify the withdrawal of retirement funds as a source of a deposit; (iii) failed to identify that the borrower's spouse's funds

were used as a deposit but the spouse was not listed as a borrower (iv); failed to identify the missing gift letter required to explain the source of deposit; and (v) failed to identify the terms and conditions for withdrawal of retirement assets. (*Id.*)

Further, on February 5, 2019, HUD provided notice to NLC that on a March 13, 2018 review that was audited by Anderson, the borrower's income was incorrectly calculated. (SF ¶ 52). Of the four loans that had deficiencies, NLC could not cure or remediate two files which created salability issues and were escalated for self-reporting to the Mortgage Agencies. (SF ¶ 53). These files exposed NLC to indemnification or repurchase risk. (*Id.*) The deficiencies discovered after Anderson's termination further supported NLC's reasons for terminating Anderson. (SF ¶ 54).

## ARGUMENT

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Long v. Teachers' Retirement Sys. of Illinois*, 585 F.3d 344, 348-49 (7th Cir. 2009). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Conclusory allegations alone cannot defeat a motion for summary judgment." *Walker v. JP Morgan Chase Bank, N.A.*, 262 F. Supp. 3d 574, 582 (N.D. Ill. 2017) (quoting *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F. 3d 890, 892 (7th Cir. 2003)).

## I.  PLAINTIFF'S DISABILITY DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW.

In employment discrimination cases, "the sole question that matters" is causation: whether a statutorily proscribed factor caused an adverse employment action. *Ortiz v. Werner Enters., Inc.*,

834 F.3d 760, 765 (7th Cir. 2016). Courts focus their discrimination inquiry on whether "the plaintiff would have suffered the adverse employment action had [s]he not been a member of a protected class." *Id.*; *Guzman v. Brown Cnty.*, 884 F.3d 633, 641 (7th Cir. 2018). Direct as well as circumstantial evidence may support an inference of causation, and thus intent. *Ortiz*, 834 F.3d at 764. A plaintiff may also use the *McDonnell-Douglas* burden-shifting framework to support her claim. *Coleman v. Donahue*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J. concurring). Here, Anderson offers no evidence to support an inference of discrimination, and thus her claim fails.

**A.  <u>There is No Direct Evidence of Disability Discrimination</u>**

To show that disability discrimination was the "but for" reason for her termination, Anderson must offer direct evidence, such as an admission that NLC terminated her on the basis of her disability or circumstantial evidence from which an inference of discriminatory intent can be drawn, like suspicious timing, ambiguous statements or behavior towards other employees in a protected group, evidence that similarly situated employees outside the protected class systematically received better treatment, or evidence that the employer offered a pretextual reason for the discharge decision. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 684 (7th Cir. 2014); *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017).

Anderson has no such direct evidence. Anderson claims Gourley made two comments immediately before (March 19, 2018) and after she returned from her extended leave (June 11, 2018) that she was "sick a lot," "missing a lot of work" and Gourley "needed a full team there to run her department." (SF ¶ 55). Gourley's alleged comments are not sufficient to create a triable issue of fact. The Seventh Circuit has held repeatedly that "isolated comments" that are no more than stray remarks in the workplace are insufficient to establish that a decision was motivated by discriminatory animus. *See Hopper v. Proctor Health Care Inc.*, 804 F.3d 846, 854-55 (7th Cir. 2015). Anderson admits that Gourley's "little comments" meant "[j]ust that, I'm sick a lot." (SF ¶

9

55). Anderson did not believe Gourley made these comments because she perceived Anderson as disabled, or that Anderson was underperforming her job duties because of her alleged perceived disabilities. (*Id*.) Anderson admits that Gourley never told her she would be fired for being sick a lot or that she would not be reinstated to her position after returning to work from her time off. (*Id*.) This dispels any contention that Anderson was discharged *because of* her perceived disability. *See Spring-Weber v. City of Chicago*, No. 18-c-4918, 2018 WL 4616357 (N.D. Ill. Sep. 26, 2018) (finding lack of evidence that the plaintiff's condition was the but-for cause of her discharge).

Anderson further claims Gourley acted "derogatory" towards her when Gourley ignored Anderson after she returned from her leave. (SF ¶ 55). But, here, Anderson lacks evidence to show that Gourley's inaction, *i.e*., ignoring Anderson, had anything to do with Anderson's perceived disability or played any role whatsoever in Anderson's termination. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 382-83 (7th Cir. 2020) (supervisor's snubbing and giving the "cold shoulder" falls into "non-actionable" behavior).

In addition, there is nothing suspicious about the timing. Anderson took multiple days off and leaves of absences throughout her employment and each time was reinstated to her position including when she returned from her FMLA leave on June 11, 2018. Without any connection between time off requests and her termination, this timing is not at all suspicious. *See Terruggi v. CIT Group/Capital Fin., Inc. d/b/a CIT Rail*, 709 F.3d 654, 662 (7th Cir. 2013).

Gourley's reaction to Anderson's time off requests were quite the opposite of discriminatory. First, during Anderson's 18-month employment at NLC, Gourley approved her time off requests including two full weeks off (*i.e*., May 5–10, 2017 and February 23–28, 2018) and an extended leave of absence (*i.e*., October 6, 2017–January 14, 2018), and NLC approved her FMLA leave (*i.e*., March 19–June 9, 2018), yet Anderson was returned to her position each time.

(SF ¶¶ 17, 19, 21, 26). Second, though NLC's Employee Handbook required Anderson to "speak to [her] manager" when she could not work, Gourley allowed Anderson to text her and accepted Anderson's daughter to call for Anderson. (SF ¶ 33). Gourley even sent Anderson flowers and Edible Arrangements and wished Anderson to feel better. (*Id*.) Further, Gourley directed Anderson to talk to Human Resources about NLC's extended leave policies and to address Anderson's concerns that her job would be protected while she took a leave of absence. (*Id*.) Finally, Gourley encouraged Anderson to ease back into her role when she returned to work rather than inundate her immediately with auditing files and permitted her to catch up on her emails and review updated Mortgage Agencies guidelines and NLC guidelines. (SF ¶¶ 25, 28, 46).

In context of the whole record, there simply is no evidence to support an inference of discrimination. *Taylor-Novotny v. Health Alliance Med. Plans, Inc*., 772 F.3d 478, 495-96 (7th Cir. 2014). For all these reasons, any argument Anderson may make under the "direct" method fails as a matter of law.

### B. Anderson's Disability Discrimination Claim Fails under the Indirect Approach

Where, as here, there is no direct evidence of disability discrimination, Anderson may attempt to prove her claim under the burden-shifting framework.[2] Anderson's claim fails under this approach for the same reasons it failed under the direct method.

First, Anderson cannot establish a prima facie case because she was not meeting NLC's legitimate expectations. Anderson was repeatedly reminded to avoid mistakes and demonstrated a pattern of poor performance in producing accurate audits before she took her extended leave. (SF

---

[2] Under this approach, Anderson must establish a prima facie case by showing (1) she is disabled, (2) she was meeting NLC's legitimate performance expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees without a disability were treated more favorably. *Lloyd v. Swiftly Transp., Inc*., 552 F.3d 594, 601 (7th Cir. 2009). If Anderson can establish a prima facie case, NLC must identify a legitimate, non-discriminatory reason for its employment decision. *Id.* If NLC satisfies this requirement, Anderson must prove by a preponderance of the evidence that NLC's reasons are pretext. *Id.*

11

¶¶ 22, 27, 30). Her performance was not consistent with an individual with the number of years of experience Anderson possessed, and Anderson admits she made these mistakes and should not "normally make mistakes." (SF ¶¶ 21, 27-28, 31). During her leave, NLC became aware of multiple deficiencies with Anderson's audits that she was expected to identify. (SF ¶¶ 38-40). This conduct undoubtedly does not meet NLC's legitimate expectations.

Further, Anderson cannot show that similarly situated employees were treated more favorably. Anderson identified Amy Skeen, Laura Gaitlin, and Gwen Monhollen as similarly situated to her, but the evidence does not support her claim. Anderson claims Skeen made the same alleged mistakes as her, was not perceived as disabled, and was not fired for making these mistakes (SF ¶ 57). However, Skeen is not directly comparable in all material aspects because she was an Underwriter and not a Pre-Fund Underwriting Auditor, did not have the same job responsibilities as Anderson, and did not report to Gourley. (*Id.*); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 635 (7th Cir. 2009) (a similarly situated employee must be directly comparable in all material aspects including performance, qualifications, and conduct). Rather, as the Pre-Fund Underwriting Auditor, Anderson was expected to catch Underwriters', like Skeen's, errors and work with them to remediate any deficiencies.[3]

Monhollen and Gaitlin, other Pre-Fund Underwriting Auditors who reported to Gourley, also are not comparable to Anderson. Importantly, Anderson offered no evidence that Monhollen or Gaitlin had similar frequency of deficiencies that were uncovered on their audits. (SF ¶ 59). To the contrary, NLC terminated other auditors who, like Anderson, had performance issues and failed to identify multiple errors on loans they reviewed for audit. (SF ¶ 60). Anderson believed Gaitlin had an alleged disability (*i.e.*, back problem), but Gaitlin continued her employment at

---

[3] Q: And [ ] –it's your job – or was your job as an auditor to catch errors if the underwriter didn't catch those errors; correct? A: Correct. (SF ¶ 8).

NLC and took two leaves of absences (SF ¶ 59), dispelling any contention that NLC treats employees who are perceived as disabled less favorably. It is Anderson's burden to identify a satisfactory comparator, which she is unable to do. *See Bunn*, 753 F.3d at 685 (failing to identify a satisfactory comparator—"that is the end of it; summary judgment is warranted.").

Even if Anderson could establish a prima facie case, NLC had a legitimate, non-discriminatory reason for discharging Anderson (*i.e.*, frequency of errors made on multiple loans reviewed for audit). It is undisputed that Anderson was aware of her mistakes, and Gourley had already multiple times reminded her to produce accurate audits. (SF ¶¶ 22, 27, 30). During Anderson's leave, Gourley became apprised of Anderson's performance issues, notified Asher who completed an investigation, and NLC decided and approved Gourley's decision to terminate Anderson. (SF ¶¶ 38-42, 49). *See Kohls*, 259 F.3d at 799. The ADA does not preclude an employer from discharging an employee because she cannot perform her job adequately. *See Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995).

Anderson cannot prove NLC's reason is pretext for disability discrimination. Pretext is "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Monroe*, 871 F.3d at 505. Anderson claims that NLC "falsified allegations of mistakes" made by Anderson and "attributed the mistakes of others" to her (SF ¶ 56), which is not the case. Anderson has not introduced a shred of evidence suggesting that NLC's explanations are lies, let alone evidence sufficient to meet the preponderance standard. *See Bunn*, 753 F.3d at 685. Further, NLC had nothing to do with HUD's selection of Anderson's audit for further review, or the timing of HUD's determination. (SF ¶¶ 16, 18-19). Anderson has not shown that NLC fabricated HUD's determination, manipulated all the files that Anderson's

reviewed, or that its belief that HUD identified errors in Anderson's audit was not honest.[4] *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 589 (7th Cir. 2020) ("In evaluating pretext, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge"). Courts will not "sit as super-personnel department" and "second-guess" an employer's legitimate reasons. *Dyrek v. Garvey*, 334 F.3d 590, 598 (7th Cir. 2003).

Anderson fails to create any triable issues of fact through direct or the burden-shifting method of proof, and the undisputed facts entitle NLC to judgment as a matter of law.

## II.    PLAINTIFF'S FMLA INTERFERENCE CLAIM FAILS AS A MATTER OF LAW

In order to prevail on a FMLA interference claim, an employee must establish that (1) she was eligible for FMLA protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Id.*

Despite pleading it in her Complaint, Anderson admits during her deposition that she has no interference claim.[5] NLC granted Anderson's request for leave and returned her to the same position after her FMLA leave. (SF ¶ 44). For these reasons, Anderson cannot establish that she

---

[4] After Anderson's termination, NLC discovered four additional loans in which Anderson failed to identify deficiencies, including another HUD audit, which NLC has no control over, that would have further supported NLC's reasons for Anderson's termination. (SF ¶¶ 51-52, 54). Anderson cannot show that the legitimate nondiscriminatory reasons offered by NLC for Anderson's discharge were lies or a sham to cover up discriminatory motives. *See Monroe*, 871 F.3d at 505.

[5]         Q: Okay. And what, if anything did you and [Taylor] discuss about your request for leave?
A: She just said that it would get approved. She emailed the papers over. I filled out what I had to fill out; sent them back to her. She filled out what she had to fill out, and she approved it.
Q: And once the leave was approved, how long were you on leave?
A: I want to say maybe 11 or 12 weeks. I don't remember the exact date.
Q: And did you return from leave during the spring of 2018?
A: I did.
Q: And when you returned from leave, did you return as a pre-fund auditor?
A: Yes. (SF ¶ 37).

was denied benefits to which she was entitled and her interference claim fails. *See Cracco*, 559 F.3d at 364-65 (finding no FMLA interference when employee was terminated after he returned from FMLA leave); *Nicholson v. Pulte Homes Corp.,* 690 F.3d 819, 827-28 (7th Cir. 2012) (finding no evidence that the employer did anything to deny or interfere with the plaintiff's right to FMLA benefits).

Therefore, Anderson's interference claim fails as a matter of law.

## III. PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW

A retaliation claim requires proof of discriminatory or retaliatory intent, which can be established directly or indirectly. *Id.* at 828. Regardless of the method of proof, Anderson's retaliation claim fails.

### A. There is No Direct Evidence of Retaliatory Motive or Action

Under the direct method, Anderson can survive summary judgment only if she presents sufficient evidence, direct or circumstantial, that NLC intended to punish her for requesting or taking FMLA leave.[6] *Id.* Anderson may allege suspicious timing between her taking an extended leave of absence and her firing. However, suspicious timing by itself rarely is enough to overcome summary judgment. *See Lutes v. United Trailers, Inc.*, 950 F.3d 359, 369 (7th Cir. 2020) (affirming summary judgment on FMLA retaliation claim because there was undisputed evidence that adverse employment action was based on the employee's poor job performance). It is undisputed that the NLC made its decision to terminate Anderson *after* she took her leave. (SF ¶ 49). The fact that NLC discovered Anderson's deficiencies while she was on leave cannot "logically be a bar to

---

[6] Under the direct method, Plaintiff must show: (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there is a causal connection between the protected activity and the adverse employment action. *Cracco*, 559 F.3d at 633. The causal-nexus element may be met through either a direct admission from NLC or through "a convincing mosaic of circumstantial evidence" permitting that same inference. *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008); *see supra*, p. 10 (discussion of circumstantial evidence permissible).

the employer's ability to fire the deficient employee." *Kohls v. Beverly Enters. Wisconsin, Inc.*, 259 F.3d 799, 806 (7th Cir. 2001). "The fact that the employer discharged the employee when [s]he returns from leave cannot be sufficient evidence to establish causation" to support an FMLA retaliation claim, "[o]therwise, the employer would be forced to continue employing a substandard employee after the conclusion of leave or risk facing liability under the FMLA." *Id*.

Also, a track record of job performance issues prior to the employee's protected activity does not establish circumstantial evidence in support of a retaliation claim. *See Long*, 585 F.3d at 354 ("a decline in performance before the employee engages in protected activity does not allow for an inference of retaliation"); *Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706 (7th Cir. 2009) (no inference that an employee was fired for improper reasons who allegedly committed fraud and impropriety despite no prior formal discipline or negative reviews); *Lutes*, 950 F.3d at 369 (no retaliation because employee was terminated for poor performance).

Gourley counseled Anderson multiple times on errors in her audits, and Anderson admitted to making mistakes. (SF ¶¶ 22, 27, 30-31). Anderson continued to make the same if not more egregious errors on her files: January 24 (missed critical appraisal information); January 25 (multiple failures); January 26 (multiple failures); and June 20, 2017 (serious failure to report that the employment verification form had been altered with correction fluid). (SF ¶¶ 38-40). These performance issues further substantiated Gourley's concern that Anderson did not have the requisite skills to perform the job that was required despite her alleged wealth of experience in the mortgage industry. (SF ¶ 41); *see Daugherty v. Wabash Ctr., Inc.*, 577 F.3d 747, 752 (7th Cir. 2009) (employer produced undisputed evidence that employee was fired for misconduct, after numerous job performance problems, so "no dispute" regarding employer's motivation for firing employee); *Cracco*, 559 F.3d at 633-34 (where employer found several performance problems

16

with employee, employee could not establish causal connection under direct method "because [employer's] actions do not suggest [employer] was acting under a prohibited animus").

Summary judgment for NLC is proper because NLC provides undisputed evidence that the adverse employment action was not based on Anderson taking FMLA leave.

**B.  Plaintiff's Retaliation Claim Fails under the Indirect Approach**

Anderson's claim fares no better under the indirect method.[7] Anderson's FMLA retaliation claim fails for the same reason her ADA claim fails. Anderson cannot establish she was meeting NLC's legitimate expectations and cannot show that NLC treated similarly situated employees more favorably. Even if Anderson could establish a prima facie case of retaliation (and she cannot), her retaliation claim fails because NLC terminated her employment for a legitimate, non-retaliatory reason and, as explained above, Anderson cannot show pretext.

**CONCLUSION**

For the foregoing reasons, Defendant Nations Lending Corporation respectfully requests that the Court grants its motion for summary judgment and grant such other relief as this Court deems just.

Respectfully submitted,

DEFENDANT NATIONS LENDING CORPORATION

By:  /s/ *Sylvia Bokyung St. Clair*

One of Defendant's Attorneys

Stacey L. Smiricky
stacey.smiricky@faegredrinker.com
Sylvia Bokyung St. Clair

---

[7] Like her ADA claim, Anderson must demonstrate she (1) engaged in a statutorily protected activity; (2) met NLC's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Simpson*, 559 F.3d at 718. If Anderson clears the hurdle of establishing a prima facie case, the burden of production shifts to NLC to state a legitimate, non-retaliatory reason for its discharge decision. *Id.* Once NLC meets this burden, the burden shifts back to Anderson, who can avoid summary judgment only by presenting evidence to show NLC's stated reason for her discharge is pretext. *Id.*

sylvia.stclair@faegredrinker.com
Faegre Drinker Biddle & Reath LLP
311 S. Wacker Dr., Ste. 4300
Chicago, IL 60606
Telephone: 312.212.6500
Facsimile: 312.212.6501

Dated: November 30, 2020

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2020, I electronically filed the foregoing

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY**

**JUDGMENT** with the Clerk of the Court using the CM/ECF System, which sent notification

of the filing to the following:

Lisa M. Stauff
Law Offices of Lisa M. Stauff
53 W. Jackson Blvd., Suite 624
Chicago, Illinois 60604
LStauff@StauffLaw.com

*/s/ Sylvia Bokyung St. Clair*

US.130172820.06